JOSEPH J. HOCK, INC. *v.* BALTIMORE
CONTRACTORS, INC., et al.

[No. 29, September Term, 1968.]

62

*Decided January 13, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, FINAN and SINGLEY, JJ.

*Delverne A. Dressel,* with whom was *Earl K. Wellschlager* on the brief, for appellant.

*J. Hardin Marion,* with whom were *Lee M. Miller* and *Tydings and Rosenberg* on the brief, for appellees.

SINGLEY, J., delivered the opinion of the Court.

Chapter 10 of the Laws of 1959 repealed and re-enacted Maryland Code (1957) Art. 90, § 11 (the Act) which requires principal contractors to provide performance and payment bonds on all contracts for public work which exceed $5,000 in amount in order to protect subcontractors and materialmen.

Subsection (c) of the Act permits persons who have furnished labor and material to sue on the payment bond if they have not been paid within 90 days after the last labor was done or the last material furnished.

Subsection (d) provides that "* * * no such suit shall be commenced after the term of one year after the date of final acceptance of the work performed under the contract. * * *"

On 8 August 1961, the Mayor and City Council of Baltimore (the City) entered into a contract with Baltimore Contractors, Inc. (Baltimore Contractors), a defendant below and

appellee here, for the construction of the Baltimore Civic Center at a cost of $7,403,000. The bond required by the statute was written by the other appellee, United States Fidelity & Guaranty Company (the Surety). One of Baltimore Contractors' subcontractors was Varsity Pre-Cast Seat Company (Varsity), to which Joseph J. Hock, Inc. (Hock), the plaintiff below and appellant here, furnished drivers and trucks during the period between 22 February and 20 August 1962. When Hock completed its contract with Varsity in August, Varsity owed Hock $6,228.32, which was not paid. On 22 August 1962, Hock notified Baltimore Contractors and the Surety of its claim, and on 25 May 1964, instituted suit against Baltimore Contractors and the Surety. From a judgment absolute in favor of the defendants for costs, Hock appealed.

The case turns on a narrow question: Was Hock's suit, brought on 25 May 1964, barred by subsection (d) of the Act, which provides that "* * * no such suit shall be commenced after the term of one year after the date of final acceptance of the work performed under the contract."? The lower court found that 10 April 1963 was the date when the job was completed and was the date of "final acceptance" and concluded that Hock's suit had been brought too late.

While the entire contract between the City and Baltimore Contractors was not before the lower court and is not before us, Raughley L. Porter, the City's Building Construction Engineer, testified that the contract contained no provision defining "final acceptance." The contract did provide that Baltimore Contractors guarantee the work "* * * for a period of two (2) years *from the date of final acceptance of the completed project* by the City. * * *" (Emphasis added)

The interplay of a number of forces produced a factual situation which was, to say the least, somewhat muddled and offered the lower court a wide choice of dates on which the City did something looking toward acceptance. The earliest of these was 23 October 1962, when "conditional" acceptance was given to the portion of the Civic Center which contained the ice rink. This action appears to have been dictated by a consideration of a wholly practical character: the first ice hockey game of the season was about to be played. The acceptance was con-

ditioned on the completion of a number of items detailed on a punch list.

As a result of an inspection of the building made on 1 February 1963, a second "conditional" acceptance was given Baltimore Contractors. This related to the remainder of the building, other than the ice rink. It was similarly conditioned on the completion of items contained in another punch list, and ultimately, apparently about 9 March, resulted in the release of $269,656.70 of the remaining contract price then being retained by the City. A balance of $100,000 was withheld until the items on the two punch lists could be completed.

By 10 April 1963, according to Mr. Porter's testimony, the items on the two punch lists had been completed. There was a malfunctioning in the ice rink's brine system, but this had been discovered after the preparation of the first punch list, and the correction which was required was regarded by the City as being included in the builder's guarantee. In any event, the work could not be done until the end of the hockey season.

On 7 June, Baltimore Contractors prepared a schedule [1] detailing the release of subcontractors' claims and the receipt of their guarantees, and sometime after 16 June the $100,000 which had been retained was released to Baltimore Contractors. It is interesting to note that the voucher which had been sent by the Bureau of Building Construction to the City's Bureau of Accounts and Disbursements on or after 28 February, authorizing the disbursement of $269,656.70 was described as a *"partial* release", while that sent on or after 11 June, authorizing the remittance of the last $100,000 was described as a *"final* release."

On 2 April 1963, Baltimore Contractors had sent a letter to Mr. Porter:

> "This is to advise that we have completed this project including the execution of all punch lists previously sent to us.
>
> "We acknowledge that the repairs to one brine pipe in the ice rink area are still pending and must await

---

1. Neither Varsity nor Hock appear on this list.

the end of the use of the ice rink this spring. Also, we recognize that the sound system is yet to be tested on April 8, 1963.

"In all other respects we have completed our contract work and ask that you formally accept this completed project so that we may make our final requisition for final payment of all our retainage due us."

Gerald J. Rhein, a member of Mr. Porter's staff, had made the following notation on the letter:

"Final acceptance of building 3/9/63—with $100,000 withheld for correction of punch list items. Punch list items were not sufficiently completed at time of final acceptance, so the $100,000 was not released until June 10, 1963, at which time we accepted the punch list items as being complete."

On 10 April, Mr. Porter wrote to Bernard L. Werner, the City's Director of Public Works:

"The construction of the Baltimore Civic Center was awarded to Baltimore Contractors, Inc., at the contract price of $7,403,000. The contractor was authorized to proceed on August 22, 1961.

"Final inspection of the project was made on February 1, 1963, and on this same date it was conditionally accepted, pending the completion of the punch list items.

"The punch list items required 37 calendar days to accomplish. . .February 1, 1963 to March 9, 1963. . . thus fulfilling all work covered by the contract.

"The specifications provide the project shall be completed on September 15, 1962, with a liquidated damage clause of $1000 per calendar day for the first 30 days and $2000. per calendar day for every day thereafter, that the work is incomplete beyond the stated time.

"The actual number of calendar days consumed for the construction of the project is computed as follows:

Actual number of calendar days consumed beyond the specified date of September 15, 1962 to date of conditional acceptance, Feb. 1, 1963 .................. 138

Actual number of calendar days consumed for the completion of punch list items, Feb. 1, 1963 to March 9, 1963 ...................................... 37

Total number of calendar days beyond September 15, 1962 ........................................ 175

Additional calendar days allowed for the construction of $968,947.28 in Extra Work Orders ............ 183

"As the subject project was completed within the allowed contract time, no liquidated damages are involved, and final acceptance shall be as of March 9, 1963."

As noted above, the statement contained in the third paragraph is not entirely accurate, since the sound system was not tested until 9 April. The purpose of the letter was to advise Werner that no penalty was to be imposed for delay.

Subsequent to the filing of Hock's suit, Mr. Porter wrote three letters to Baltimore Contractors. On 26 June 1964, he said:

"This is to advise you that the final inspection of the ice rink and its operating equipment was made on October 23, 1962, and accepted subject to the completion of punch list items. The guarantee for this portion of the project will run to October 23, 1964.

"The final inspection of all other portions of the Civic Center project was made on February 1, 1963 and accepted subject to the completion of punch list items. The guarantee for these remaining portions will extend to February 1, 1965."

On 8 October 1964, he said:

"In compliance with your verbal request, please be advised that our records indicate our final acceptance of the subject project is March 9, 1963."

On 2 June 1965, he said:

> "All punch list items were resolved, and the project finally accepted on March 9, 1963.
>
> "Final payment was approved by the Director of Public Works and the Building Construction Engineer on June 10, 1964."

Virtually the same question raised by this appeal has been before this Court on two prior occasions. *United States Fidelity & Guaranty Co. v. Hamilton & Spiegel, Inc.,* 241 Md. 133, 215 A. 2d 735 (1966); *Baltimore County Department of Education v. Henry A. Knott, Inc.,* 234 Md. 417, 199 A. 2d 369 (1964). In *Hamilton & Spiegel,* which involved a contract for the construction of additional classrooms at the Bethesda Elementary School, the Montgomery County Board of Education took possession of the classrooms on 26 August 1961; by resolution adopted 25 September 1961, accepted the project "contingent upon the completion of certain contractual items"; but the architect's certificate of completion was not issued until 22 November 1963; and final payment was made under the construction contract on 15 June 1964. The subcontractor's suit against the bonding company was filed on 29 March 1963. In that case, we held that the one-year period of limitations commenced with the filing of the architect's certificate and that the subcontractor's suit had been timely filed.

The facts in *Knott* are similar. On 14 July 1961, the Baltimore County Board of Education accepted the Loch Raven Junior High School, and instructed the school's principal that the one-year guarantee period was to commence on that date. On 8 August 1961, the contractor was paid the remainder of the contract price, except for $23,000 which was withheld pending correction of certain defects. On 20 December 1961, the architect filed a certificate authorizing final payment to the contractor. The suit for the use of the subcontractor was filed on 4 December 1962. We held that the filing of the suit was not barred by the Act. Judge (later Chief Judge) Prescott, speaking for the Court, said:

> "Our statute states, that no suit shall be filed later than one year after 'date of final acceptance of the work

performed under the contract.' The cases directly in point relative to our determination here do not seem to be numerous, but those which have been cited to us and those which we have found are uniform in holding that a 'final acceptance' to start the time named in the statute running must be unqualified, unconditional and for a complete performance of the contract." 234 Md. at 424.

*See also, Williamsport Planing Mill Co. v. Maryland Cas. Co.,* 129 N.J.L. 333, 29 A. 2d 731 (Sp. Ct. 1943); *John J. Nesbitt, Inc. v. Mass. Bond. & Ins. Co.,* 38 Ohio L. Abs. 299, 49 N.E.2d 765 (Ct. App. Ohio 1942); *R. P. Farnsworth & Co. v. Electrical Supply Co.,* 113 F. 2d 111 (5th Cir. 1940); *Yale & Towne Mfg. Co. v. Aetna Cas. & Surety Co.,* 110 N.J.L. 592, 166 A. 473 (Ct. Err. & App. 1933).

We are mindful of the fact that both *Hamilton & Spiegel* and *Knott* were cases where architect's certificates were involved and that no certificate was called for in the contract for the construction of the Civic Center. We do not regard the certificate of an architect [2] (or, for that matter, of an owner) as the only manner in which the dates of completion and acceptance may be determined. In instances where no certificate is called for, the dates of completion and acceptance must be developed from the facts.

Even in *Knott,* Judge Prescott laid great stress on the contract provision which read, "[f]inal payment shall be due thirty (30) days after work fully completed and contract fully performed." Inferentially, at least, this seems to support the argument that there can be no acceptance until completion, and that there can be no completion so long as a portion of the contract price is held back to secure full performance. In the case before us, paragraph 33(f) of Baltimore Contractors' agreement with the City provided, "Final payment will be made within thirty-

---

2. For a case where the architect's certificate was not regarded as controlling, *see* Johnson Service Co. v. Globe Indemnity Co., 77 Ohio L. Abs. 503, 148 N.E.2d 116 (1957), *aff'd* 77 Ohio L. Abs. 507, 149 N.E.2d 38 (1957).

five (35) days after the completion and final acceptance of the entire work under the contract." Since final payment was made some time after 11 June, this would seem to eliminate both 9 March and 10 April as dates of completion and acceptance.

We think that the term "final acceptance of the work performed under the contract" as used in the Act means what it says: it refers to a date when the contractor's responsibility to the City (except for liability on the guarantee provided for in the contract) and the City's liability to the contractor are at an end. 23 October 1962, when "conditional" acceptance was given the ice rink and 1 February 1963, when a second "conditional" acceptance was given the remainder of the structure, fail to meet this test. There clearly remained services for Baltimore Contractors to perform, and the City was still withholding payment of the balance of the contract price.

9 March 1963, which the City seems to have adopted retroactively as the acceptance date, and 10 April 1963, the date selected by the lower court, are equally unsatisfactory. On the former, the punch lists were still not completed, and on both dates the City was still withholding. Nor do we regard as significant the City's selection of 23 October 1962 as the date when the two-year guarantee commenced to run on the ice rink and of 1 February 1963 as the date when the guarantee commenced to run on the rest of the building. While this question is not before us, these dates would hardly appear to qualify as "the date of final acceptance of the completed project" from which the two-year guarantee was to run. The City's waiver of a contract right does not alter the contract's terms.

As we see it, "final acceptance" could not have been before 11 June 1963, the date when the City, having accepted the subcontractors' releases and guarantees, authorized the release to Baltimore Contractors of the $100,000 which had been withheld. Consequently, Hock's suit, brought on 25 May 1964, was commenced within one year of final acceptance, and was not barred by the Act.

Since we do not regard Hock's letter of 22 August 1962 to the Surety as a demand for payment, interest on the claim should run from the date suit was filed. *R. T. Woodfield, Inc.*

*v. Montgomery County,* 252 Md. 33, 248 A. 2d 895 (1969) ; *Peerless Ins. Co. v. Board of County Comm'rs of Prince George's County,* 248 Md. 439, 237 A. 2d 15 (1968).

> *Judgment reversed, and judgment entered against appellees for $6,-228.32 with interest from 25 May 1964; costs to be paid by appellees.*